Some people may think also has maybe some jurisdictional issues, but it's PG&E v. Lynch and others, the California PUC, let's see, the PUC or the appellants, right? Go ahead. May it please the Court, Harvey Morris appearing for the appellants, Public Utilities Commissioners. I'm going to try to reserve five minutes for rebuttal if possible. We have two issues on appeal, the Eleventh Amendment and the Johnson Act. And on Thursday we filed a new case from the Ninth Circuit dealing with dependent appellate jurisdiction ability to review the Johnson Act argument. We provided courtesy copies in case the Thursday filing didn't make it to the Court. For more than 87 years, the California Public Utilities Commission, based upon its state authority under the State Constitution and Public Utilities Code, has protected the consumers in the State of California from the monopoly power of the California electric utilities by ensuring that they charge just and reasonable rates and deciding what the overall retail rate level can be. This authority of the State Public Utilities Commissions is so crucial to the states that Congress itself has passed two laws designed to protect the state authority. In 1934, Congress enacted the Johnson Act, which had the entire purpose of prohibiting federal district courts from entertaining litigation over constitutional challenges to State Public Utility Commission orders affecting utility rates. Except in limited circumstances. Not for constitutional challenges, Your Honor, but preemption has been considered. Well, that's one of the issues, isn't it, whether they're intertwined with other issues? No, Your Honor, for the dependent appellate jurisdiction issue, there's a question whether. I'm not talking about dependent jurisdiction. I'm talking about the wording of the Johnson Act itself. In other words, where the case raises both constitutional and non-constitutional issues. That's right. That's a matter of first impression as to whether the Johnson Act applies in a Ninth Circuit. The Ninth Circuit's never addressed the issue. The three courts that have addressed the specific issue of when there's a statutory claim and constitutional claims against the State Public Utilities Commission have all ruled that you have to at least dismiss the constitutional claims because that's the very purpose of the Johnson Act. But the Ninth Circuit's never addressed it. What about the Hawaiian telephone case? That case was only a preemption claim, Your Honor. There was no constitutional claims even in the case. But it did address the Johnson Act. As to the preemption claim surviving the Johnson Act. Well, that's a type of constitutional claim. It's a foremissive clause. Right. And what the courts have ruled is it's a statutory and a constitutional claim both. And therefore, under the Johnson Act, they've ruled that the preemption claim, if it's substantial, survives the Johnson Act. So, I mean, it seems to me reasonably clear that you could dismiss the constitutional claims and still have statutory claims. If the preemption somehow gets treated as statutory, I don't know why, but that's the way the President goes. If there's some substance to the preemption claim, that would survive. But the Court should dismiss the constitutional claims. And this Court that we're seeking review of did not dismiss the constitutional claims. So at a minimum, those should have been dismissed. We also are here arguing that there isn't any substance to the preemption claim, and so there wasn't subject matter jurisdiction over that as well. Why more or less substance than any other preemption case? Because the Federal Power Act explicitly preserves State jurisdiction over how to set the retail rates. And the only way you can have preemption claim under the Federal Power Act for the retail rate jurisdiction, the State commission, is if there's conflict preemption. And conflict preemption requires some conflict between a Federal tariff, a Federal regulation, a Federal order, or something in a Federal statute that there's a conflict between. PG&E has not been able to point to any such Federal statute, FERC order, FERC tariff. They're using Federal common law, however, in the form of the filed rate doctrine. They're saying this is a conflict with the filed rate doctrine, which has developed through case law, Federal case law. The case law itself finds a conflict between what the Federal Energy Regulatory Commission has approved and what the State has disallowed. So the filed rate doctrine, under the common law, always finds something that there's a conflict between the Federal agency and the State agency. Here we have cited four FERC orders, three dealing with AB 1890 itself, saying how the State sets the retail rate and how the wholesale power costs are recovered versus the stranded costs is something up to the State to decide. There is no tariff provision, like there was in Duke Energy, which actually dealt with the issue. The FERC said that's for the State to decide, and there is no tariff provision that gives rise to the filed rate doctrine that there's a conflict within. The other thing is that the FERC decided in Middlesouth decisions, cited by Arkansas Power and Light many years ago, that because the States decide retail rate making, they will not decide at the FERC level how to pass through the wholesale power costs. So the four FERC decisions that have been briefed all favor the State regulation over how the power costs and stranded costs are decided at the retail level. PG&E has no answer to any of those cases, but the Federal agency itself is on the side of the State on how the retail rates operate, and there is no conflict between the Federal government or the State. And Congress, in the Federal Power Act, and the Connecticut Light and Power case is very clear on this, the legislative history of the Federal Power Act, Congress went to great lengths to say it's trying to protect State jurisdiction over the setting of retail rates. We cite that in the Connecticut Light and Power case, and there's one part from the House report where it says the power of the State to set the retail rate, even for power bought from outside the State, is left undisturbed. So the congressional intent has to be the touchstone of any preemption analysis. And when Congress goes out of its way to say we're preserving State jurisdiction to set rates, even for how wholesale power flows through, when the Federal agency itself says in the four orders that have been cited in our briefs that it's up to the State how those costs are passed through, there is no basis for conflict preemption. There's nothing of substance to this case on preemption basis. And therefore, what really is going on is State law issues, which are barred by Pennhurst, the issues we're going to trial with are State law issues, what revenue sources could be made available to recover the wholesale procurement costs, how long the rate period is. Those are not issues that involve the wholesale power cost setting. That's how you set retail rates. Speaking of State law issues, is there a proceeding pending in State court? There seems to be some hint in the briefs that something's going on in State court. The State courts have resolved the matter in favor of the PUC. PG&E challenged the PUC's order that's challenged in the Federal District Court, Decision 01-03-082, saying we violated State law in how we applied the revenue sources to the recoverable costs and how we decided the rate period issues under AB 1890. The California Court of Appeals ruled against PG&E. We put that in the record. It's in the excerpts of record. And then the Cal Supreme Court denied the petition for review. So the State law matters have been resolved in favor of the PUC. And those are referred to on page 9 in a footnote in our opening brief. Your Honor, speaking of not having an answer, their brief is full of sights of the horizon, and you scarcely touch it. I think if you're going to win on all fronts, you've really got to explain how that isn't controlling. Thank you, Your Honor. I'm going to go back to our original argument, the Eleventh Amendment itself under Coeur d'Alene Tribe. I know, but that's a circuit issue. Tell us about the Supreme Court. All right. The Verizon case did not overrule Coeur d'Alene Tribe. It didn't even deal with the level of intrusiveness that the Court ---- Before, of course. But here it was, the utility and so forth and so forth. It's very hard, I think, almost impossible to overlook what the Court did. Yes. If there's limited relief sought under ex parte young, there's no question that Verizon supports the ability to go after State officials. But not when it's extremely intrusive relief. That's what Coeur d'Alene said the difference was. When you're divesting the State of its authority itself, then you are violating the Eleventh Amendment, even if you name individuals. That was not an issue in Verizon as clear from the way that they granted Sir Sherrari. They found that it was a Federal regulatory function under Telecommunications Act that was being alleged to be violated. It wasn't even a State interest. It was a Federal regulatory function. And so you don't even have the Coeur d'Alene analysis of what is ---- if there's a State interest, the intrusiveness of the relief sought. But this Court in Cardenas, in a decision after Verizon, still cited Goldberg v. Ellett, a Ninth Circuit decision, saying it is the level of intrusiveness that decides whether Coeur d'Alene is a bar. And we have focused on the level of intrusiveness of this case, which is far different from the Verizon case, where they didn't seek to strip the State of regulatory powers. It was just how the State enforced something under the Telecommunications Act. There are four broad areas of attack on the State's authority to set retail rates in PG&E's complaint. First, PG&E is attacking AB 1890 itself. It's right in the declaratory relief paragraph 95 of the complaint. It's right in the prayer for relief for a declaratory injunctive relief. They want to stop the enforcement of the State law itself. That is a factor this Court in Goldberg v. Ellett says shows when there is sweepingly intrusive relief, as had happened in the A&R pipeline case, which this Court followed and was illustrative. Secondly, all the Ninth Circuit cases involving Coeur d'Alene have said, if you impose an affirmative obligation on the State, that is showing that it is very intrusive that Coeur d'Alene may apply. Here PG&E seeks to require the State to only provide for concurrent recovery of wholesale power costs in the monthly bills the customers of the utility pay. The State has never been required to do that in the 87 years that we have been regulating State retail rates. And if that had happened in the time period of the six or seven months that there was this flare-up of costs to PG&E, instead of a 40% rate increase, probably the largest increase we did in our history for electric utility rates, it would have been more like a 400% increase. That would have wiped out a lot of businesses, people on fixed income that couldn't afford bills, and yet we would only be required, according to PG&E's complaint in paragraph 53, to concurrently pass through the FERC-approved costs immediately without any rate stabilization, without any regard for whether the costs we have determined really were incurred by the utility, and whether or not there were revenues that could offset those costs. PG&E's paragraph 53 faults our decision for not concurrently providing the immediate recovery of costs through the rates of the utility.  So that would impose an affirmative obligation on the State Commission in California and everywhere else in the Ninth Circuit. If the State has no control over the overall retail level, and regardless of what happens in the wholesale market, the State must increase the retail rates immediately. I want to just understand this in more concrete terms, and maybe you could just slow down a bit and let's just focus on the claims. And there's two preemption claims, that's all that's before us. The takings claim is not before us, correct? The pure constitutional takings claim. Yeah, that's not before you. It's just the two preemption claims. And I just want to understand exactly what their claim is and why you think this is intruding into the State regulatory area. As I understand it, other distributing companies or distributing oil companies file rates with FERC at which they set and FERC approves the price at which they will be able to sell the energy wholesale. Is that right? And FERC approves that. Yeah, FERC approves the wholesale price, including if it's left to the marketplace. FERC decides that. Okay. So now in this case, FERC approved California's 1980 leave it to the marketplace rate, or did the pre-leave it to the marketplace rates apply, pursuant to rate schedules that were on file with FERC? These were market-based rates based on FERC approval of market-based rates that were the wholesale prices that the PUC did not question should be recovered in the retail rates. All right. So those prices are there. Then we have this June 2000 soaring of prices. Now, did FERC in any way alter the wholesale rate charges based on the fact that the charges, the cost of energy was going sky high at that time? FERC has ongoing proceedings to look about refunds for the unjust and unreasonable wholesale. I'm trying to get to why California's action in not providing for revenue relief or only providing for minimal revenue relief is a violation or somehow requires the energy companies to do something that would violate Federal law. We don't require the utilities to violate Federal law. In fact, we found that there was sufficient revenues in their banalty accounts to recover those costs. That's a whole other issue. Okay. About those accounts. But the point is that there's nothing that the PUC did to require the utilities to violate the FERC's ruling. They were bound by the FERC's ruling on wholesale rates, and they had to comply with that. And at the same time, the prices are going sky high, and that means they're paying those prices to get the energy. And you're failing to act, or the CPC fails to act, by making them equal in terms of the revenue to be charged for the energy to the public. Is there some law that requires you to do that? Isn't there some regulatory procedure by which you are required to make sure that the energy companies, which are required to provide the energy, are getting reimbursed for their costs? Under the filed rate doctrine, if the State says what FERC has approved is unreasonable and doesn't provide for the recovery in the retail rate, then the State could be found to violate the filed rate doctrine. The State of California, the PUC, did not find that the State utilities could not recover those costs, but we looked at their revenues, including imputed revenues, in the accounting systems, based on the buildup of billions of dollars of previous revenues recovered by the utility during the rate freeze period itself, determined, number one, that that fully recovers the FERC-approved costs, and, two, we increased rates 40 percent on top of that to help with the liquidity issues of the utilities. But this Court in U.S. West v. Nelson recognized how integral it is to rate making to look at the accounting system to determine what the rates did, including the imputation of revenues. Let's go back to the first part of your answer to my question. So isn't that the substantive question that PG&E wishes to pursue, and that is whether or not you violated the federal common law filed rate doctrine by failing to make that determination that you're required by law to make? Isn't that the substantive question? Except that every court in the 67 years since the Federal Power Act has looked at the method for how you recover the FERC-approved costs, as opposed to whether you recover the FERC-approved costs, has ruled in favor of the State. But the State has the right to decide the method. You're not really answering my question, counsel. What I'm trying to say is, isn't that the substantive issue yet to be decided? And the question, you're saying, well, we have immunity, because if you look at this issue, you're intruding into provinces of State regulation that Coeur d'Alene doesn't allow you to intrude into, or that the Johnson Act doesn't allow you to litigate. But assuming we were inside those questions, then you would later litigate whether or not PG&E violated its obligation to act and whether or not it used appropriate accounting methods. But since the Federal Power Act left to the State the method of how to decide the retail rate, and because FERC has left to the State to decide how to do that, and there's nothing in a FERC tariff that dictates how the State should recover the costs, there is no preemption of the State in determining the method as long as it's fully recovered. That's what the Third Circuit explicitly held in Kentucky, West Virginia. It said as long as you've given legal effect to the rate on file with the FERC, it doesn't have to be immediately recovered, because that's all the file rate doctrine requires, that you give positive effect and don't challenge what FERC has done, and how long it takes and the method the State takes to do that might raise a constitutional issue, which is barred by the Johnson Act. Isn't that examining the merits of the claim? It's not going into the merits of the claim, because every court that has looked at the issue has said the Federal Power Act left to the State how to set the rate, and there's only conflict if the State does it in a way different from how FERC has required or a tariff provision governs. And there is no conflict here. So now we are trespassing into the delegation to the State by the Federal Power Act itself, and that can't be part of a conflict preemption analysis. The Supreme Court in a Northwest Pipeline case involving the Natural Gas Act said to even determine conflict preemption, you have to respect what Congress itself has decided and given to the State for authority. And where Congress has decided that the State commissions decide how the retail rates operate, you cannot find there to be conflict preemption. You've got about a minute left. Well, I'm trying to save it for rebuttal, Your Honor. All right. Thank you. We'll give you a couple extra minutes, all right? Thank you. Good morning, and may it please the Court. Marie Fiala representing Plaintiff Appellee Pacific Gas and Electric Company. Let me begin with a very brief description of what PG&E's claims actually involve, because there has been some confusion on the part of my learned opponent on that score. PG&E, under the deregulatory scheme implemented by the California Public Utilities Commission, was required to buy 100 percent of its power demand in two new federally regulated markets, the PX and the ISO. The prices charged for wholesale power in both of those markets were set at market-based rates pursuant to tariffs filed with the FERC. There were FERC-filed tariffs and federally regulated wholesale prices. During the California energy crisis from June 2000 through the first quarter of 2001, wholesale prices skyrocketed to as high as $1,000 per megawatt hour or more, while PG&E's state retail rates, which are regulated by the PUC, were frozen at $54 per megawatt hour. That difference caused an enormous shortfall by March, $9.2 billion, between the costs that PG&E paid out to buy wholesale power and the revenues that it was able to collect from ratepayers under the frozen rates effective under AB 189. Is that true even taken into account, the surplus account? Yes, Your Honor. That is true. That is an absolute net difference between PG&E's out-of-pocket costs to buy power. The shortfall persisted because PG&E repeatedly requested rate relief from the PUC and was denied that relief. Ultimately, the company was forced to file for bankruptcy in March of 2001 and is still in bankruptcy trying to recover from the effects of that regulatory failure. PG&E has pleaded Federal preemption claims, alleging that this shortfall between its federally regulated wholesale costs and its state-regulated retail revenues constitutes a violation of the filed rate doctrine. The filed rate doctrine has been a part of our Federal law for over 50 years, and it holds very clearly that the states, while retaining jurisdiction to regulate retail rates, in doing so must allow a utility's full federally regulated costs to be recovered as operating expenses in retail rates. Two of the leading cases cited in our brief, Nantahala v. Thornburg and Mississippi Power & Light, say very clearly that where a state exercises jurisdiction over retail rates, it may not trap at the utility, the utility's wholesale costs. Now, didn't one of the changes the PUC made was to require PG&E to apply the surplus in the TRA to your deficit in the rates? Yes, Your Honor. In what has been referred to as the accounting order, passed in March 2001, four months after PG&E first instituted its litigation, the PUC determined that if you apply the surplus in the TRA  So what's the result? PG&E is still out of pocket on a net basis if you apply the surplus. But, Your Honor, I need to point out that this issue of whether PG&E has pleaded a valid preemption claim is not, or whether the accounting order complies with the filed rate doctrine, whether the State has complied with Federal law, is not before the Court on this appeal, although appellant has devoted substantial time to that issue in its briefs and the argument this morning. Well, Judge Walker seemed to think it was. In other words, he thought, you know, both the immunity question and the merits were intertwined, that you couldn't decide one without the other. Your Honor, Judge Walker also held that PG&E had pleaded a valid preemption claim and that the filed rate doctrine applied to PG&E's wholesale power purchases. All I'm getting at is, you know, whether or not he's right in saying, you know, that the two are intertwined and that we have to look at the merits of the claim. Your Honor, under Verizon, the Supreme Court's decision in Verizon said It was already decided before Judge Walker decided his case. Yes, it was. And in the October 18th decision in which Judge Walker found this appeal to be frivolous and without merit, Judge Walker correctly noted that Verizon expressly forbids the Court to undertake an analysis of the merits. Does that mean he changed his mind? I think he became aware of the significance of the Verizon decision to his ruling, Your Honor, correctly finding that it forbids an analysis of the merits. Under Verizon, all that is required is a straightforward inquiry into whether the plaintiff has alleged the traditional components of an ex parte young claim. First, that a State officer has acted in violation of Federal law. And second, that the plaintiff seeks prospective relief rather than compensatory damages. Again, the Court said expressly that that straightforward inquiry does not allow any inquiry or analysis of the merits of the claim. And those allegations are clearly made in PG&E's complaint. Now, what is the character of the prospective relief? As I understand the complaint, it's almost are you asking for refunds in the future? I mean, you can't undo that you went into bankruptcy and that they ordered the rates. And I'm having difficulty understanding why you characterize this relief as prospective. The relief is prospective in the same sense that it is in every filed rate case that has been litigated over the last 50 years. It requires the State in prospectively setting retail rates to set them high enough to allow PG&E to collect the shortfall that it experienced between wholesale costs and its prior retail rate revenues. That shortfall is still recorded in the regulatory accounts of the utility. And the prospective relief is to compel the PUC in prospectively setting retail rates to conform those rates to Federal law, to PG&E's interpretation of Federal law. Now, granted, the parties disagree about whether the PUC's accounting order does or does not comply with Federal standards. That is not an issue for this Court today. That is hopefully an issue for the district court when and if this case is remanded for trial. But that is not an issue that informs the ex parte Young 11th Amendment analysis. Nor the other. By the way, just a matter of curiosity, is it true, I think I read this in one of the papers on one of the motions, that 95 percent of what you recover will go to the non-utility parent? Your Honor, the utility is wholly owned by PG&E Corporation. Is it true that 95 percent of what you recover will go to the parent? Yes, Your Honor, that is correct. That is correct. The Corporation, that is correct. How much does that own, the parent? I'm sorry? What percentage? It owns 100 percent of the utility. The Corporation. Why didn't you put in your brief it owned over 10 percent? I'm sorry. Why didn't you tell us it was 100 percent? I'm sorry, Your Honor. You say it owns more than 10 percent in your disclosure statement. Are you telling us now it's 100 percent? Yes, Your Honor, more than 10 percent. I would think a candor would require 100 percent in the disclosure statement. Do you understand me? I understand, Your Honor. When did these companies get split? In, I believe, in 1996, the holding company was formed. 1995 or 1996, but I believe it's 96. Years ago, I used to be a stockholder in PG&E. I know there was no, not two layers of it. We were certainly not trying to mislead the Court. We were following the language of the Court's certificate. The whole business of splitting them, certainly to the public, I'm no longer a stockholder. I'm just one of the public. It seems very strange. But what is the, do they own 100 percent of the utility? What else do they own? They own unregulated affiliate companies involved in various aspects of the energy business in other states. They, among other things, run a natural gas pipeline, operate generation facilities in New England and in other states, and own a variety of diversified businesses generally in the energy. Any energy. In some cases, they are on the selling side of power, Your Honor. Well, I think a little disclosure would have been appropriate. Your Honor, we apologize. We certainly had no intent to mislead. The statement of the PUC that the rates would have gone to, what did it say, 1,000 percent or 4,000 percent, if the full cost, the way you want them, had been recovered at once from the customers, what would they have gone to? What would the retail rates have gone to? Well, the utility, as I mentioned, the rates were frozen at $54 a megawatt hour. The market at times went as high as $100, $500 or $1,000 per megawatt hour. And you thought they should have gone right under the customers. I'm sorry? You think that should have gone right under the customers? Well, Your Honor, it would not – it is hard to predict for any individual customer how that would have affected that customer's utility bill. And presumably, that would have been spread over time. But it is the – How would that have been spread over time if you needed to get it right away? Well, Your Honor, that doesn't mean that every customer's bill would have instantaneously increased by a factor of 10. Every customer's bill would have increased. They wouldn't have been getting it back? There is no question that this would have had an impact on the utility's customers. Isn't that, in fact, what the PUC claims it is doing, spreading it out over time? No, Your Honor. You know, through the TRA accounting and all that? The CPUC has never made any statement about allowing PG&E to collect its under-collected costs experienced during the wholesale energy crisis. Let me – just jumping back and understanding this broader picture. So if you prevail, then you're asking for an injunction that requires the CPUC to set rates higher in the future to make up for the vetties that PG&E lost during the energy crisis. That's correct, Your Honor. Okay. At the same time, I believe this is correct, the CPUC now is suing or going before FERC, perhaps suing some energy suppliers to get compensation for the energy. Now, is that compensation that's also going to the rate payers if they prevail on those lawsuits? There is a large refund proceeding at the FERC in which PG&E, Southern California Edison, and the PUC are seeking refunds from the wholesale sellers. If those refunds are conclusively awarded by FERC, they will be returned to the utilities, and from there returned to rate payers. There's no question of double recovery here. And simultaneously, we have lawsuits against energy suppliers going on to also secure recovery for the overcharges, if there were any? I'm aware that there is such litigation, Your Honor. PG&E is not a plaintiff in such cases. And such claims, in my view, are barred by the same filed rate doctrine on which PG&E relies here, because the sellers were selling into the market under FERC tariff federally regulated rates. And the filed rate, a different application of the filed rate doctrine precludes seeking damages from a seller under a FERC-filed tariff. But that is not the application that's at issue before this Court. So hasn't FERC itself made some refund orders? Yes, Your Honor. But those proceedings are not yet closed. They are ongoing. We have just finished an extended period of discovery. There may be further hearings, and the matter is not finally resolved yet before the FERC. Do you agree that the express constitutional claims are barred by the Johnson Act? No, Your Honor. I do not, for two reasons. First, I believe that under Hawaiian Telephone, this Court has read the first provision of Section 1342, subsection 1, quite narrowly, and has said that the word solely in that section where jurisdiction is grounded solely in the Constitution is to be read to mean that the jurisdiction arises exclusively on repugnance of the order to the Federal Constitution. And in this case, jurisdiction does not arise exclusively on constitutional grounds. It's based on repugnance of the order to the Constitution and preemption under the Federal Power Act. But second, and we haven't heard about this yet this morning, the Johnson Act also requires, bars a claim only where the order which is challenged does not interfere with the Commerce Clause. PG&E here has put the second subdivision of the Johnson Act says that the claim is subject to the Commerce Clause. The Commerce Clause claim is subject to the Commerce Clause. PG&E has a Commerce Clause claim here. And under the authority of the Commerce Clause claim, Your Honor, appears at the sixth page. And under the Supreme Court's decision in Public Utilities Commission v. United Fuel Gas, which is cited in our brief, the Supreme Court held that a suit in which a utility challenges a State commission's rate orders is not barred by the Johnson    commission's rate orders from interfering with the State commerce, to the extent that they constitute an attempt to regulate matters in interstate commerce which Congress has lodged exclusively with the Federal Power Commission, which is now FERC. Precisely those same allegations are pleaded here. PG&E has pleaded that the PUC's refusal to permit pass-through of its wholesale power costs, which are incurred in interstate commerce, constitutes an attempt by the PUC to indirectly regulate interstate commerce and thereby interferes with interstate commerce. That fact alone takes this entire case out of the Johnson Act. Yes, Your Honor. The costs are incurred in interstate commerce. And, in fact, contrary to Appellant's assertion, the law is quite clear, not to hollow Mississippi Power and Light, that the Favre Doctrine is an exercise of field preemption, not conflict preemption. The theory is that when the State denies a utility recovery of its federally tariffed costs, it is indirectly regulating in the wholesale realm, which is exclusively jurisdictional to the Federal Government and regulated by the FERC. It's not an exercise of conflict preemption. It is an indirect intrusion into an area of exclusive Federal jurisdiction. That further supports the conclusion that the claim PG&E has alleged here also alleges a violation of the Commerce Clause and an interference with interstate commerce. And given that allegation, this complaint falls outside the Johnson Act. All right. Ms. Feller, further on the Johnson Act, I assume you've seen the PUC 28J letters citing the Meredith v. Oregon on the pendent jurisdiction. Yes, Your Honor, I have. On the issue of pendent. What's your response to that? My response is that Meredith does not change the prior law of this circuit on the issue of pendent appellate jurisdiction. And the pendent appellate jurisdiction over the Johnson Act issue is not proper here. First, because this case – in this case, the Johnson Act issue is not inextricably intertwined, as it is decided under different legal standards than the Eleventh Amendment issue. And second, because pendent appellate jurisdiction is not necessary to get – ensure meaningful review. The Johnson Act allows at a minimum the preemption claim to go forward. We submit that it allows all of the claims to proceed because the complaint alleges an interference with interstate commerce. But this is not a case where determining the Johnson Act issue would mean that this Court would not have to reach the Eleventh Amendment issue. That's essentially the holding of Meredith. That pendent jurisdiction may be exercised where consideration of a question of subject matter jurisdiction would allow the – would be dispositive in terms of whether the Court had to reach the other issues present in the appeal. That's not the case now. These are entirely separate issues, and disposition of the Johnson Act issue does not mean that the Eleventh Amendment issue is thereby mooted. That was the case in Meredith. That is not the case in this matter. For that reason, we believe that the Johnson Act appeal is procedurally improper. It is not properly before this Court, either under the collateral order doctrine or under principles of pendent appellate jurisdiction. Would you respond to counsel's distinction of Verizon when I asked him the question why it was different? You heard his answer. What's your comment on that? Your Honor, I cannot distinguish the facts in this case from the relief from the claims that the Supreme Court allowed to go forward in Verizon. That was a claim by Verizon alleging that an order of the State Public Service Commission violated the Telecommunications Act, and it was a challenge brought under Ex parte Young, just as many other filed rate and preemption cases have been brought under Ex parte Young. The Supreme Court looked only at the allegations and explicitly disclaimed looking at the merits, and said that so long as the plaintiff had met the prerequisites of Ex parte Young, an ongoing – alleging an ongoing violation of Federal law by State to proceed past the – past the pleading stage to an analysis of the merits. More than that, Your Honor, I think it's impossible to distinguish the relief sought here from that which this Court – those claims that this Court allowed to proceed in Agua Caliente and Duke Energy. In fact, I would submit that if anything, the relief sought in Agua Caliente, for example, where the plaintiffs sought to completely divest the State's authority to tax revenues derived from operations on Indian tribal lands, that claim was allowed to proceed under Ex parte Young and was distinguished as being different and less intrusive than Coeur d'Alene. This case does not divest – attempt to divest the PUC of jurisdiction over retail rate making. Every preemption claim, if valid, results in a limitation of the State's discretion in the area of retail rate making. This case is no different. We are not seeking to divest the PUC of jurisdiction. We're only seeking to compel the PUC to comply with Federal law in its rate making processes. This case is no more intrusive than the relief sought in Duke Energy, where the Governor's very powers to commandeer contracts under the emergency powers of the State were challenged, and yet that claim was allowed to proceed. So we submit respectfully that under Verizon and precedent in this circuit, the Ex parte claim is proper and should go forward. Thank you. Thank you very much. All right. Rebuttal. I just want to hit a few points. First of all, I want to correct the error that the surplus in the balancing accounts did not – weren't enough to recover all the wholesale power costs. The California PUC explicitly found in the decision that it would fully recover all the wholesale power costs and CPUC-approved operating costs, but leave less money available for stranded costs. That's an excerpt of record, page 67. I'm sorry, but what about stranded costs? There would be an under-recovery of stranded costs that are retail stranded costs and not a filed-rate doctrine issue. All right. And that has been upheld by the two state courts. We also have a supplemental excerpt of record for our reply. In the state court proceedings, was there a filed-rate doctrine issue raised? No. No. All right. Go ahead. And in the reply excerpt of record at page 42, there's a paragraph 37 where the declaration filed in the district court by the PUC, based on PG&E's own records with the CPUC, said not only does it fully recover all the operating costs of the utility, but there's still $7.7 billion available for stranded costs. So that's clear that the surplus were enough to cover all the operating costs. Secondly, on the 11th Amendment, unlike Verizon and unlike Duke Energy, we are being stripped of two critical areas of our regulatory powers. Duke Energy pointed out the example that it was only one single contract that the governor had commandeered. But if a whole general area under the governor's emergency powers, like the supply of electricity, was removed in a complaint or sought its relief in a complaint, that would rise to quarterly type of intrusiveness. We are being losing the ability to look at other revenue sources available to the utility, because the utility's complaint says we can only do concurrent rate increases in monthly bills. We've cited four cases, including this circuit's case in U.S. West v. Nelson, the U.S. West v. Tristani case in the 10th Circuit, the Jeffrey decision in the 5th Circuit, and Rochester Gas Electric in the 2nd Circuit, all in our opening brief of how important it is to look at other revenue sources available to the utility. PG&E's complaint would not allow us to do that. We also will lose the ability to stabilize rates. We can't decide, and we've lost control over the overall retail level, if the wholesale power costs increase, and there has to be a concurrent increase in rates. The state is losing control to protect the consumers, pure and simple. It is not just one single incident, but a general obligation, an affirmative obligation to require concurrent recovery of all wholesale power costs. That was the challenge in paragraph 53 of the complaint. In paragraph 95, we're indicted for not having timely recovery of costs. We are losing general area of authority in this complaint. The Johnson Act, I'd like to quickly address in two areas. One is, this Court has never decided whether the jurisdiction solely based on replicants of the Constitution should apply to the entire action or on a claim-by-claim analysis. So the Hawaiian case doesn't address that issue. The Second Circuit in Evans, the First Circuit in Patch, and the Wisconsin Federal District Court case in Midplains all did address that issue. Instead, you look at the jurisdiction of the Court on a claims-by-claims basis, and constitutional claims are dismissed under the Johnson Act. In terms of interference with interstate commerce, this Court's decision, U.S. West v. Nelson, is dispositive of the fact that mere allegations in a complaint are not enough to get you around the Johnson Act. It would be too easy to evade the Johnson Act with mere allegations. In U.S. West v. Nelson, which we cite in our opening reply brief, the Court said because the plaintiffs couldn't tender evidence in the motion to dismiss stage of what was the interference with interstate commerce, just because there was an effect on interstate commerce is not what interference with interstate commerce means in the Johnson Act. And evidence is controlling in this case. The Public Utilities Commission v. United Fuel case, which counseled for the plaintiff has just cited, dealt with stipulated facts where there was no question that there was interference with interstate commerce. There was no just allegation. It was stipulated facts. And the State tried to regulate the interstate pipeline itself, not the State-regulated company that was only dealing with intrastate rates. So that case does not apply. Finally, you cannot argue that Congress meant for field preemption of retail rate-making in the Federal Power Act when in Connecticut Light and Power, for three pages, the U.S. Supreme Court cites legislative history after legislative history after legislative history of how important Congress sought to protect State jurisdiction over retail rates and services. In fact, even the setting of rates when power is bought from energy outside the State, Congress left to the State to decide. That can't possibly be field preemption. Thank you. Is the State proceeding final now? No, Your Honor. We are looking at the stranded cost recovery and ongoing proceedings because we are concerned about restoring the utilities to financial health. And even in November 7, 2002, we lifted a condition on the sole basis that we needed to restore the utilities to financial health. We want the utilities to be able to procure electricity. That is part of our obligations. So there are ongoing PUC proceedings on some of the issues about how the utilities deal with the stranded cost. But it is final as a State law that the utility has recovered all of its wholesale power costs. This is a decision by what body? The PUC has numerous ongoing proceedings involving California retail rate-making and the issues of the financial problems of the utilities caused by this flare-up in wholesale power and the effect it had on their liquidity and their ability to recover even their stranded costs. So on the stranded cost issue, which is not implicated by the filed rate doctrine, we have ongoing proceedings to look at that issue. But we have decided finally, and the State courts have upheld this finding. But what court? The State Court of Appeals and the State Cal Supreme Court both denied PG&E's petitions for review the finding of the PUC in the accounting true-up decision that the wholesale power costs were fully recovered and that the revenues available under AB 1890 time period are able to be used to offset the flare-up in the wholesale power costs. Any of those decisions that would be of interest to us, whether they could be made, you would give us references of what we could find. On page 9 in our opening brief, we refer to the rulings of the State Court of Appeals, and we have it in the excerpt of record, and we give the Lexis site for the Cal Supreme Court denying the petition for review. We also cite the footnote that even when a court rules with a few sentences to deny petition for review, this circuit in the communications tele-systems case found that that is a decision on the merits for State law. And so page 9 of our opening brief gives you the roadmap that Your Honor has just requested. Just out of curiosity, I don't think it's before us, but let me ask you, what impact does the bankruptcy proceeding have on the ability of the PUC's rate-making authority? None? Well, we think, and I'm not really an expert on that, maybe I could defer to other counsel, that the bankruptcy code cannot dictate the rate-making functions of the state commission. Is it part of the police bar exercise or something like that? I think there's explicit provisions under the bankruptcy code, but I'm not really the expert on that, and I obviously didn't prepare for that type of a question. I'm not prepared either. I'm just curious. PG&A has not challenged the application of the bankruptcy law as an intrusion of the Well, in the bankruptcy proceeding, it's not challenged the PUC's presence as some kind of intrusion of Federal law into a State function. Your Honor, we have asserted the Eleventh Amendment in the bankruptcy proceeding with regard to PG&E's plan, which tries to dictate certain matters involving State rate-making. So that is an issue for the bankruptcy court at the moment. But we also have an alternate plan to get PG&E out of bankruptcy, and for purposes of our alternate plan, we have waived the Eleventh Amendment for that purpose in the bankruptcy court, so that there could be a binding decision to get PG&E out of bankruptcy under our plan and that we would have to adhere to. Or maybe for all plans you've waived it, right? Who knows? But that's not something we have to worry about. All right. Thank you very much. And we thank both counsel. This case is submitted for decision. Last case on today's calendar. We will stand in recess at this time. Aye. This call for discussion is adjourned. This call for discussion is adjourned. This call for discussion is adjourned. This call for discussion is adjourned. This call for discussion is adjourned. This call for discussion is adjourned.
judges: Noonan, Tashima, Wardlaw